Good morning. May it please the Court. My name is Marty Lieberman. I represent the appellant, Terry Pierce. I think the first thing the Court needs to consider in this case is what Officer Butler relied on to ask what I submit to you are extended and intrusive questionings with respect to Mr. Pierce's activities prior to the stop. Officer Butler approaches, sees a map, sees fast food wrappers and two trash bags, sees signs of nervousness and one or two hanging flannel shirts. That's what he has to go on at this point. What does Officer Butler do with those, I submit to you, innocuous facts? He has Mr. Pierce get out of the car. That's not justified for any safety reason. His purpose is he's going to ask him additional questions. It's conceded, isn't it, that this was a legitimate traffic stop? Yes. The man was speeding. Yes. There's no question about that. That's not the issue. He was kind of happily surprised to get a warning ticket. Yes. No question about that. No. The propriety of the stop is not an issue. It's what happens after the stop that becomes the issue. Is it your position he shouldn't have been asked to get out of the car? No. I don't think, I think an officer is permitted to ask somebody who stopped for a traffic ticket to get out. But he could stop him and he could ask him to get out of the car. That's correct. Okay. And I had raised that because I think it goes to extending the duration of the stop. And by asking all of these extensive questions, Officer Butler extended the duration of the stop in violation of Terry and all of the cases that are cited in the brief. There's no justification to go off on that intrusive. Well, there was a fair amount of nervous behavior, wasn't there? Yes. Okay. His hands were shaking. Yes. That's one of the things. Secondly, he observed rapid talking, a shift in the way he would talk. That was not initially. That was after he had him get out of the car and started asking all of these detailed questions. But if a person's behavior changes during the course of the interrogation, isn't that a factor that can be considered by the policeman in asking further questions? Is it a factor? The nervousness is normal. I think that's what the courts have come to the conclusion. But a change in behavior, if there's a change in behavior, can that justify further interrogation? In and of itself, no. Can't? I don't believe it can in and of itself. I think you have to take that along with all of the other factors. And if you look at the Arvizu case out of the Supreme Court, where they said, you know, you've got to look at the forest, where, you know, you're looking at the totality of the circumstances. And I think that would be one of the trees in the forest. But I think your answer has to be it depends upon the nature of the change in the behavior. If the nature of the behavior is he suddenly starts running away, screaming, you got me, you got me, well, I mean, that's probably in itself enough. Okay. I think that's fair. I think that's fair. It's the nature of the behavior. And that would give it more or less weight in the totality of the circumstances analysis. Does it matter what the officer's subjective intent might be? Probably not. Let's suppose the officer notices and stops a person legitimately for a traffic stop and notice nervousness and says to himself, I want to calm this situation down a bit. This guy's really excited. So I'm just going to engage in a little bit of chitchat. How are you doing? Where are you going? Where are you coming from? Anything wrong with that? Once it gets to the point of intrusive questioning there is, no matter what the officer's subjective intent is, understand, you know, after Wren, the officer's subjective intent appears to be pretty much irrelevant, and that's the pretext stop situation. I don't know why it should change in this situation. Intense, irrelevant, but the questions are asked and inconsistent or evasive answers appear. Can the officer go further? I think Judge Fletcher's point is well taken here. It depends on the nature and the weight, if you will, of the inconsistencies. Where does the stop take place? Where? On the interstate highway. Where? Outside of Kingman, Arizona, on mile post 46 or 44, something like that. Let's suppose that the officer asks him how long have you been driving, and he says eight hours. Where are you coming from? And he says Bullhead City, which I will tell you is not eight hours away. I would agree.  Can he go any further? These are. Yeah, I suppose in your hypothetical he could go further. But I think what you have to look at is, is he permitted to ask these questions when he's stopping somebody for speeding? The case is and the Ninth Circuit's never really answered that question. Can you ask about travel plans when you've just stopped somebody for speeding? The Eleventh Circuit and the Tenth Circuit have the Pruitt and the Wood cases where they say no, you can't. You get the driver's license, the registration. You do what you need to do. You can do a driver's license check, for example, or a registration check, which wasn't done in this case. But you are not permitted under Terry principles. Didn't the Ninth Circuit address this in United States v. Perez, which is 37F3-510, the 1994 case, that this Court said that Perez's nervous behavior, his avoidance of eye contact with the officer, and his profuse perspiration first caught the officer's attention, all are suspicious factors, even if they would not alone be sufficient to justify continuing questioning. So that you look at the factors such as perspiration, avoidance of eye contact, other types of nervous behavior. And in this case, the officer said that all of these things were present. The officer said his hands were shaking. There was rapid talking. There was shifting weight back and forth. He was stuttering and he was sweating. He broke eye contact. He looked at the ground. Those are all factors that occurred in the course of some questioning. I think you have to look at when did these factors occur, because you've got, you know, let's break this down into three parts. You've got the first part is should he have started the questioning to begin with. And I'm suggesting to you, no. A lot of the factors that occur. He shouldn't ask many questions to begin with. He stops for speeding, going at a high rate of speed illegally. He shouldn't ask many questions at all. He can ask any questions that are reasonably related for the reason for stopping, for the purpose of the stop. And I think the cases are pretty clear about that. And that the Ninth Circuit addressed this peripherally and didn't answer the question in the Chavez-Valenzuela case. It's footnote four. And it said questions regarding travel plans are probably justified, but we don't have to answer that question. And this was and I submit to you that in this case you may have to answer that question. I understand your argument to be that you can look at the totality of the circumstances, including nervousness or not making eye contact or rapid talk, whatever it is, so long as the officer was asking permitted questions. But as soon as the increased nervous reaction is in response to non-permitted questions, that nervous reaction he can't pay any attention to because it's coming as a product of his non-permitted questions. And so you're saying, well, the rapid talking comes after he's asking questions that aren't permitted. I think that's your argument. Yes. So the question for us then is, okay, at what point are the questions no longer permitted and the product of those questions no longer available to him to use as a basis for suspicion for the continued stop? Correct. That's the first part. I see I've got about a minute and a half left. I want to save a minute for rebuttal. Even if you take all of those factors, I don't think you have enough there to detain him further. So what questions shouldn't they have asked him? Pardon me? What questions should they not have asked him? There was no reason to ask questions relating to where he had been, what the name of his friend was, where did his friend live, why the short trip. None of that had anything to do with speeding. Well, what about he was driving 7,000 miles in two weeks. The car was overdue. He said he went to San Bernardino for one day and he couldn't say why it was only one day. And interestingly enough, even though the car rental was overdue and Pierce provided the explanation I called in an extension, it was never checked. That obviously didn't rise to that great a level of suspicion. I see I've only got about a half a minute left I really would like to reserve. Our questions extended you. We'll give you a minute for rebuttal. Thank you for your argument, counsel. We'll hear from the government at this time. Thank you, Your Honor. Police and court, my name is Tom Simon. I'm an assistant United States attorney. It's the government's position that the totality of the circumstances did provide the officer with reasonable suspicion to extend the detention of the defendant in this case, which would allow the ultimate search and seizure of the ---- In your view, were any of the questions not permitted? All of the questions were permitted, Your Honor. So everything. He can ask him where he's going. All he needs is he stopped him, he sees the shirts, flannel shirts in the window, he sees fast food wrappers, he sees an atlas, and he sees his hand shaking, and then he can get him by the door, he can ask anything he wants. Well, I would submit to the court that those are rather innocuous factors and that they would not certainly create any reasonable suspicion on the part of the officer. That means he knows when he starts his questioning. Well, I would also offer that questions related to travel are reasonable inquiries under the circumstances. Why are they reasonable? Well, I think, for example, the officer might want to determine where this person is going. In other words, is he a doctor? He has to, you know, go deliver a baby or something to that effect. The sort of where's the fire question? In essence, yes, Your Honor. I think it's reasonable to determine. Is there any reason to suspect that he was asking that sort of question? No, but I think it's, again, I think from the circumstances that travel questions are reasonable. Well, but you gave me a travel question that is. Are all travel questions reasonable? I think a general question with regard to travel is not unreasonable under those circumstances. I think you just said all travel questions are reasonable or not. A general travel question would be reasonable, yes, Your Honor. Can the, could a driver in this circumstance say to the officer, officer, I was speeding, and I'm very sorry for that. And I will be happy to answer any questions you have about my having sped. But I respectfully decline to answer any questions that are not directly related to the nexus of why you stopped me. Can he do that? I would suppose, yes. And what do you think the officer's reaction would be? Well, I don't believe when an individual is asserting his right to remain silent that there can be anything negative. I'll answer any question you want. You want to ask about the car, the cruise control, the horsepower, size of the wheels, how long I've had a driver's license restriction. You know, whatever you want. That's all fair game. But no other questions. I just won't answer. What do you think would happen? I don't know in that circumstance. You don't think the dog would come out? Maybe not. Maybe not. But here what happened was when he started to ask some questions, the answers themselves and the behavior of the individual seemed to be suspicious. Isn't that it? I mean, it's not that he either refused to answer questions. He didn't refuse to answer questions. He didn't say he would limit his answers. What he did was start to appear to be evasive. He started to perspire. He started to shift feet from one to the other. Now, that could be consistent, couldn't it, with just total innocence and being stopped by a cop and feeling very uncomfortable under the circumstances? How do you justify that it would lead to further questions? Well, I would offer to the court that the increased nervousness on the part of the defendant and his responses and the answers that he was providing, the substance of the answers. In other words, when he said he was visiting this friend in San Bernardino and had only gone for one day, traveled from Tennessee to San Bernardino, and, again, the increased nervousness as these questions continue. Why would you travel that distance just to visit a friend for one day? When you visited that friend, you didn't even go to see, go to his house. You simply called him from a hotel. I mean, those kinds of substantive answers led to continued suspicion on the part of the officer. This was the Arizona Department of Public Safety? That's correct. Highway Patrol. Judge Fletcher and I were on a case back in December involving a stop on the interstate between Phoenix and Flagstaff. That happened, the DPS unit happened to have a video camera in it. The case is Calderon Flores. We decided it by a memo dispo. But the thing that struck me about this case, in comparison to that case, is how remarkably similar the actions of the officer were. Pullover, chit-chat, warning, and then just as the guy starts to walk away, do you mind if I talk to you a little bit more? And then a series of questions that get more and more detailed. The purpose of this lead-up is the question, do you know whether this is a standard routine by DPS that their officers are taught to engage in this kind of chit-chat to elicit possibly inconsistent information that might lead to justification for a further search? I don't recall if it's part of their training or not, Your Honor. I'm sorry, I didn't hear you. I don't recall for sure whether that's part of their training or not. You don't recall? Did you ever know? Well, I seem to recall some reference during the course of the hearing that the officer mentioned that there was some training that he received with regard to what he was going to say. He says that was not part of my training. When he was asked why didn't you do X or Y. Correct. And when he said have a nice day, there's some question whether that was something that he may have gleaned from his overall training in the matter. Well, when you get back to the office, you might take a look at Calderon Flores. It was decided in December by memorandum disposition. And if the tape is still available, take a look at it. How fast was he going when he was stopped? 82 to 83 miles per hour in a 75-mile-per-hour zone. And is it customary to give merely warnings when somebody is 82 to 83 in a 75 zone? I can't answer that question, Your Honor. What strikes me, and this is kind of a follow-up to Judge Hawkins' question is, that from the very beginning this looked to him like, well, maybe from the very beginning when he walks up to the car, maybe even earlier than that, but certainly by the time he walked up to the car, he's treating this as, you know, I may have a drug runner here rather than I just have a speeder. And every question thereafter is calculated based upon that assumption on the part of the officer. Well, from the hearing testimony, Your Honor, the officer did say that from his training and experience those factors which he initially noted about the vehicle, the shirts, the trash bags, the open atlas and the handshake, at least from his training put him on notice that this may be a person that he is dealing with that may be involved in drug or narcotic activity. That certainly didn't lead him to the reasonable suspicion. And if we adopt your position, it sounds to me as though this really gives pretty much carte blanche to an officer having made a legitimate stop, which this was, to engage in a whole series of seemingly innocuous questions, seemingly that the person has been stopped. And if he can elicit some inconsistent responses, if he can elicit some nervousness, if he can elicit by the end of the conversation enough grounds to bring out the canine unit, bingo, that's where we are. I mean, I think that's what the holding you're asking us to give. It's not in the sense that if the defendant had not exhibited increased nervousness, if he had not given answers which were inconsistent with reason, then he would not have been able to continue the question of the defendant. But I would submit that based on the increased nervousness and the increased inconsistencies, the information that he provided led the officers to continue answering those questions. So just the general question with regard to travel is not, again, from the government's perspective, an unreasonable question. Had he not exhibited those increased signs of nervousness, had he not provided the inconsistent information, then he would not have been able to legitimately continue the questions which we've talked about. Why was this not on tape? I don't have a response to that. This is the only other case that was on tape beginning to end. I don't know if that's standard with DPS or not. I don't have an answer to that. And I did not ask the officer why. Did the defendant testify in the motion to suppress? He did testify. Did he deny the allegations or the police officer's testimony? Is there a dispute of fact as to whether or not he evidenced this type of behavior and gave these answers? And if I may, he testified as to just one very limited issue, and that was whether he told the officer that it was okay to search his car. And that's the only question that he was asked, and it was limited to that basis. Otherwise, he did not testify during the course of that hearing. So it was uncontradicted in terms of the police officer's testimony as to what the police officer observed. That's correct. And it's your view that the types of responses that he gave and the behavior that he exhibited justified what, further detention or further inquiry? That's correct. Or both? Further detention or further inquiry, both. Yes, Your Honor. Again, responding to Judge Fletcher, I don't believe that this is a carte blanche situation allowing the officer to just ask anything that he wanted to ask. There has to be some basis for the officer to ask those questions. And again, the nervousness, the increased nervousness. Now, I recognize that- Wait a minute. Let's start. He walks up to the car, and I think we're all on the same page with respect to what he sees when he walks up to the car. He sees the flannel shirts on the hanger in the window. He sees the fast food wrappers. He sees the Atlas, and he sees shaking hands. That's all he sees. That's correct. And that's enough that in his mind he has some suspicion. And at that point, he starts asking about travel. Correct. In your view, it's okay to ask about travel plans, like where you've gone, how long you've been on the road. Those questions are okay. In a very limited sense. And what, in your view, is the limited sense? Just simply the course of travel. And if there is some further indication of increased nervousness or inconsistency- Why is it okay when you say in the course of travel? Why is that a legitimate question? I understand, and I would totally agree, that it's a legitimate question if he says, is there an emergency? Like, are you a doctor? Or where's the fire? I understand that. But this was not obviously that question. It was a much more sort of open-ended general set of questions about where you've been, where you're going, and so on. What justified that general question or those general questions? Other than his initial observations and a general question in that area. What did it have to do with the purpose of the stop, those questions? Based on his initial observations and the fact that he had- Based on his initial observations, you mean those questions were based upon his suspicion that there may be drugs? I think that's what you said to me earlier. That was part of his training. That put him in notice that, yes. Okay. So in your view, the purpose of the questions really was to find out if there's something more to justify the suspicion he had of drugs. It may have been, but the officer's subjective intent, I don't believe, was at issue. I submit that- So come back, then, to what do these questions have to do with the purpose of the stop, which is speeding? And I would simply offer the Court a general question with regard to travel. It is not intrusive to- No, I'd ask a different question. How is that question about travel related to the purpose of stop? I didn't ask whether it was intrusive. I asked how is it related. You can respond to that question. We've taken you over your time. Go ahead. Other than offering the Court that I would submit that it's a reasonable area of inquiry for the officer. I didn't hear you say that it was related, then. A person's course and travel and why it was related to the stop of speeding on the interstate, it seems to me that it would be a legitimate area of inquiry to the officer. Okay. But I still didn't hear you say it was related. I just heard you say it was legitimate. Do you have any idea? You may say, listen, I can't tell you why it's related because I can't think of a reason. That's a fair answer. I think that is the answer. Okay. Thank you for your argument, Mr. Simon. We'll give you a minute for rebuttal. Counsel? After stressing about rebuttal, I really don't need much. The government's position would create a carte blanche. You can ask any questions about anything at any time, and that's just contrary. He didn't ask any questions about anything. He didn't say, are you a drug dealer? He didn't say, I mean, there are all sorts of questions he could have asked, but he didn't ask any questions. Well, at some point he did ask him if he had drugs in the car, and I think there's cases that say, no, you can't do that. Is it your point that the questions that he asked, like where are you going, where have you been, how long have you been traveling, who did you see, they're not travel-related questions? Is that your point? The questions that he asked were not travel-related questions. They were all, where have you been? He never asked where he was going. All right. Thank you. Thank you for your argument. Thank both counsel for their arguments. They're quite helpful. The case just argued will be submitted for decision.
judges: Hawkins, W.fletcher, Breyer